IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2016 at Knoxville

**BRUCE D. MENDENHALL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2007-D-2738     Steve R. Dozier, Judge**

—————————

**No. M2015-02091-CCA-R3-PC – January 25, 2017**

—————————

The petitioner, Bruce D. Mendenhall, was convicted in 2007 of first degree premeditated murder and sentenced to life imprisonment. His conviction was affirmed on direct appeal, and his application for permission to appeal was denied. Subsequently, he filed a petition for habeas corpus relief, which the court treated as a petition for post-conviction relief, alleging that trial counsel had been ineffective. Following an evidentiary hearing, the post-conviction court concluded that the petitioner's claims were without merit. The record on appeal supports this determination. Accordingly, the order of the post-conviction court denying relief is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, JR., J., joined.

Nathan D. Cate, Nashville, Tennessee, for the appellant, Bruce D. Mendenhall.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The facts upon which the petitioner's conviction was based are set out in the opinion of this court on the direct appeal:

[The petitioner's] trial began on May 10, 2010. The victim's sister Roxanna Wayman testified that Ms. Hulbert [the victim] had a history of drug and alcohol addiction, and Ms. Wayman was aware that Ms. Hubert [sic] was engaging in prostitution at the time of her death.

Nicholas Turner, the head of security at the Travel Centers of America truck stop in Nashville, testified that he discovered the victim's body in the early morning hours on June 26, 2007. Mr. Turner found the body at approximately 12:50 a.m. He checked to see if the victim was breathing and "didn't see anything so [he] called 911." He estimated that the first police officer arrived approximately thirty seconds to one minute after he made the emergency call. On cross-examination, Mr. Turner testified that he was training another security officer that night. The officer, Robert Nelson, left at approximately 12:15 a.m. Mr. Turner "had him basically tail [him] on [his] duties. . . ." While walking with Mr. Nelson around the truck stop, Mr. Turner showed Mr. Nelson a hole in a fence near where the body was found. Mr. Turner testified that prostitutes and drug dealers would enter the property through the hole in the fence. Mr. Turner testified that he had last checked the area where the victim's body was found at approximately 12:15 or 12:20 a.m., and he had not seen the body there.

Sgt. Robert Durbin was patrolling the area of downtown Nashville on June 26, 2007. At approximately 1:00 a.m., he was dispatched to the Truck Stops of America in response to a dead body. When he arrived, he met with private security officer Nicholas Turner, who took Sgt. Durbin to the area where the body was discovered behind some parked trailers. Sgt. Durbin testified that "it was plainly apparent to [him] that [Ms. Hulbert] was deceased." She was naked and had "blood all over her head." She was lying on her back and her feet were positioned with the soles together and her knees spread apart. Her left hand was stretched out beside her with her wrist turned up. She was wearing an ID bracelet, and the name on it was clearly visible.

Sgt. Stephen Beck of the Metro police department arrived at the crime scene after Sgt. Durbin. Sgt. Beck noticed "some blood droplets" on the ground between two trailers. He also saw a "muddy area outside of the trailer going towards the area [where the body was found] and there was a footprint in there. . . ." Sgt. Beck testified that the footprint "seemed out of place as there were no other footprints in and around the area."

2

Officer Tim Matthews looked in several trash barrels around the truck stop, searching for weapons, women's clothing, anything with blood on it, or any plastic similar to the plastic found under the victim's head, but he did not find anything. He also searched under the trailers.

Lt. Frank Regans was the supervisor of the crime scene. He worked in the identification unit. Lt. Regans took two castings of two different shoe prints found in the area of the victim's body.

Officer Charles Linville testified that the victim's face and head were bloody. There was also blood on the victim's feet. She also had scratches and bruises. He collected swabs from the victim's chest area, thigh area, and stomach.

Lee Meeks saw the victim in the evening on June 25, 2007. Mr. Meeks, the victim, and a man named "Hollywood" were "just riding around using drugs" in Hollywood's van. Hollywood stole "six to eight cases" of beer and sold the beer. They used the money from selling beer to buy "crack." At approximately 10:20 to 10:30 p.m., they parked near the truck stop. Approximately 45 minutes after they arrived, the victim left the van. Mr. Meeks thought the victim was going to walk to White's Front Market to meet "her old man Derrick." The last time Mr. Meeks saw the victim she walked between two parked trucks. The victim did not return to the van. Mr. Meeks and Hollywood left at approximately 1:30 a.m. Mr. Meeks testified that he did not contact the police when he learned that the victim had been killed because he had a criminal record. He was interviewed by the police while he was incarcerated for vandalism, and he agreed to submit a DNA sample.

Joseph Uhlir, a retired truck driver, had parked for the night at the truck stop in Nashville. He testified that he arrived "roughly maybe about 11:00 to the 12:00 midnight frame roughly." He "backed [his] rig" into a parking spot in the back where it was "kind of secluded." He noticed another truck park beside him. He testified that it drove in "faster in [his] opinion than normal." He also thought it was unusual that the truck parked in the opposite direction as his truck. He testified that the truck was also blocking another truck to its left. Mr. Uhlir radioed the truck beside him to tell him that he was blocking another driver, and the driver stated that he was "not going to be [t]here that long." Mr. Uhlir finished working on his logbook, listened to the radio "just for a little bit," and "climbed in the back and tr[ied] to get some rest." He then heard the engine of the truck beside

3

him. The engine got "louder and louder." Mr. Uhlir looked out of his window to make sure the truck did not collide with his truck while reversing, and the headlights blinded him. Mr. Uhlir testified that he "thought the tractor was white," but that "it could have been a light yellow color[,] too. . . ." He testified that the other truck was at the truck stop for less than half an hour.

Medical examiner Feng Li performed an autopsy on the victim. The victim was 25 years old at the time of her death. She died from a gunshot wound on the back right side of her head. The projectile was still in the victim's head, and based on the location of the bullet, Dr. Li determined that the victim was shot from behind and at a downward trajectory. The wound was consistent with a "close range gunshot wound" because there was soot material around the entrance wound. Dr. Li testified that the victim "would have died instantly" from the gunshot. The victim also had an abrasion caused by some type of blunt object near the gunshot entrance wound. Dr. Li testified that the victim had "multiple blunt force injuries" and other cuts and abrasions. Dr. Li described the victim's other injuries. She had bruises and contusions around her left eye, nose, and forehead and around her neck and chest. She had superficial cuts on her hands. Dr. Li testified that the victim's injuries could have been inflicted by a nightstick. Dr. Li testified that the victim also had a laceration of the anus, which he testified was inflicted at the time of death or after the victim's death. The victim also had contusions around her genitalia. Dr. Li testified that those injuries were caused by blunt force and could have been caused by an erect penis. Dr. Li testified that the victim had a "large area of skin defect on the right buttock area," which Dr. Li testified could have been caused by a razor. The wound was approximately two inches by two and a half inches and was likely caused at the time of death or after death. Dr. Li collected a rape kit and DNA swabs from the victim's body.

Sgt. Postiglione testified that he viewed the videotape recordings obtained from the truck stop and two neighboring businesses and developed a suspect vehicle. On July 12, 2007, he and Detective Lee Freeman went to the truck stop to "locate some fuel tickets." As he drove towards the truck stop, Sgt. Postiglione observed a yellow tractor trailer similar to the truck he had observed in the video drive past the truck stop. Sgt. Postiglione followed the truck around the block and into the truck stop, where the truck parked in the parking lot. Sgt. Postiglione approached the driver's side of the truck and "banged on the door." There was no response, and he noticed the curtains had been pulled closed. He "banged on the door a second

4

time[,]" and Sgt. Postiglione saw the curtain open and saw [the petitioner] "looking down" at him. Sgt. Postiglione showed his identification and asked to speak to [the petitioner], and [the petitioner] exited the truck. [The petitioner's] shirt was "all the way opened[,]" and he was not wearing shoes. Sgt. Postiglione testified that [the petitioner] "was making motions like he had just woken up like he had been asleep." Sgt. Postiglione explained that he was looking for a vehicle similar in description to his, and they "had a little brief discussion." Sgt. Postiglione then asked [the petitioner] if he would submit DNA samples, and [the petitioner] consented. [The petitioner] also provided Sgt. Postiglione with his Illinois driver's license. Detective Freeman took DNA samples from [the petitioner].

Sgt. Postiglione noticed what "appeared to be blood drops on the driver's door, several blood drops." He asked to search [the petitioner's] truck, and [the petitioner] consented. Sgt. Postiglione stepped into the truck and "sat on the back mattress." He noticed a bag between the driver's seat and the bed, and he looked inside. He saw what appeared to be bloody clothing. He asked [the petitioner] if he could explain the contents of the bag, and [the petitioner] told him that he had cut his leg getting in and out of his truck and that he would "wipe the blood and then place it in the bag." Sgt. Postiglione asked [the petitioner] to show him the cut. [The petitioner] pulled up his pants leg, but Sgt. Postiglione testified that he saw no cuts, scabs, or scars on [the petitioner's] leg. He testified, "[The petitioner] couldn't explain it any further."

Inside the truck, Sgt. Postiglione also saw a pair of black shoes. He picked them up and noticed that the tread pattern was similar to the tread pattern of a footprint found near the victim's body. He showed Detective Freeman the shoes and asked if he thought it looked similar, and Detective Freeman agreed that it did. Sgt. Postiglione testified that, prior to getting in the truck, he asked [the petitioner] if he had a weapon in the truck, which [the petitioner] denied. Sgt. Postiglione testified that he asked [the petitioner], "is this the truck [they]'ve been looking for[,]" and [the petitioner] "shrugged his shoulders. . . ." Sgt. Postiglione testified that he asked again if it was "the truck [they]'ve been looking for[,]" and [the petitioner] shrugged his shoulders again. Sgt. Postiglione then asked [the petitioner] if he was "the person [they'd] been looking for[,]" and [the petitioner] "just looked at [him] and he shrugged his shoulders." [The petitioner] then responded, "[I]f you say so." Sgt. Postiglione then asked [the petitioner] again if there was a weapon inside the truck, and [the

5

petitioner] admitted that he had a .22 caliber gun inside. Sgt. Postiglione testified that he knew that the victim was killed with a .22 caliber gun. Sgt. Postiglione placed [the petitioner] under arrest, and [the petitioner] was taken to General Hospital to be examined and then taken to police headquarters. At the headquarters, Sgt. Postiglione advised [the petitioner] of his Miranda rights, and [the petitioner] agreed to give a statement.

In a videotaped statement, [the petitioner] is seated across the table from Sgt. Postiglione and Detective Freeman in a small interview room. Sgt. Postiglione read [the petitioner's] rights to him, and [the petitioner] answered affirmatively that he understood his rights. [The petitioner] then stated that he had stopped at the Pilot truck stop and "fueled up" when David Powell and Richie Keim approached him. [The petitioner] stated that "they walked up" and asked, "Where're you going now?" [The petitioner] told the men that it was "none of [their] business," and the men stated that it was "[their] business now." [The petitioner] stated that David rode with him in his truck to the TA truck stop, and Richie followed in another vehicle. [The petitioner] thought there was a third person in the vehicle. [The petitioner] went inside the TA to get something to eat. When he returned to his truck, the victim "was sprawled out in the back." The men told [the petitioner], "It's your problem, not ours," and left. [The petitioner] then "proceeded to clean the mess up." [The petitioner] stated that the victim was not wearing any clothes, and there were "bags over her head." He stated that "there was blood everywhere." [The petitioner] told detectives that he had a .22 caliber rifle in his truck and that he believed the victim was shot with his rifle. He stated that the men "meet [him] everywhere." He did not know how the men knew where he was. He "dumped her body" behind the truck trailers at the truck stop. He stated that he displayed her body "in plain view." He stated that the men "were laughing about" having had sex with the victim. When Sgt. Postiglione asked [the petitioner] if the victim had been cut, [the petitioner] stated that the men had told him that "she had a good tattoo." Sgt. Postiglione had not mentioned that the victim had a tattoo. [The petitioner's] demeanor while giving the statement appeared calm.

Sgt. Postiglione subsequently located and interviewed Mr. Keim, Mr. Powell, and Mr. Sanders and obtained their fingerprints and DNA samples. Sgt. Postiglione testified "[t]here was no[t]--one shred of evidence suggesting any of these individuals were involved."

6

Detective Freeman testified that he reviewed the video recordings obtained from the truck stop and neighboring businesses and developed a suspect vehicle. That truck drove to the back area of the truck stop and parked during the relevant time frame. The truck left "within a certain amount of time without doing anything else, going to the gas pumps or anything else." Detective Freeman also corroborated Sgt. Postiglione's testimony about the detectives' initial encounter with [the petitioner].

Lori Young, who is Richie Keim's mother, testified that Mr. Keim has Asperger's disease and schizophrenia. She testified that Mr. Keim is "wholly disabled" and cannot testify, enter into legal agreements, or drive a vehicle. In June, 2007, Mr. Keim was living with Ms. Young in Franklin, Kentucky. She testified that he was not able to leave without her supervision. Ms. Young testified that it was not possible that Mr. Keim left Kentucky and went to Tennessee without her knowledge. When officers investigating the case came to talk to her, she allowed them to take a statement and DNA from Mr. Keim.

Ms. Young testified that she met [the petitioner] in 2002 when her truck broke down in Maryland, and she "received a ride from a truck driver or two" until she got to her home in Arizona. She testified that she rode in [the petitioner's] truck for "[t]wo, maybe three" days. [The petitioner] offered to rent a house to Ms. Young, and she lived in that house for "[t]wo and a half to three months" before she moved out. She saw [the petitioner] "[m]aybe once at the bowling alley but [she] didn't speak to him[,]" and that was the last time she saw [the petitioner].

Terry Wayne Sanders, II, testified that he lived in Elwood, Indiana. He testified that he had spoken to [the petitioner] on two separate occasions in 2001. The first time he spoke to [the petitioner] was after Mr. Sanders and some friends had "vandalized his house" by wrapping toilet paper and plastic wrap around [the petitioner's] trees and front porch. Mr. Sanders was 15 years old at the time. [The petitioner] confronted Mr. Sanders. Mr. Sanders later dated [the petitioner's] niece and talked to [the petitioner] one other time in the fall of 2001. Mr. Sanders was in Albuquerque, New Mexico, on June 25, 2007, because his mother had been involved in a car accident. Mr. Sanders' niece and grandmother were killed in the accident. Mr. Sanders arrived in Albuquerque on June 22, 2007, and returned to Indiana on July 2, 2007.

Danny Davis was [the petitioner's] employer through his small trucking firm at the time of [the petitioner's] arrest. Mr. Davis testified that [the petitioner] had worked for him for approximately one year at the time of [the petitioner's] arrest. Mr. Davis recalled a conversation between [the petitioner], [the petitioner's] wife, Mr. Davis, and Mr. Davis's wife, in which Mr. Davis asked [the petitioner] "why he liked these big truck stops. . . ." Mr. Davis stated that "them lot lizards will be crawling all over your vehicle in the big truck stops." Mr. Davis testified that "lot lizards" is a slang term for prostitutes. [The petitioner's] wife "smacked him on the shoulder and said, '[Y]ou better not be messing with any lot lizard.'" [The petitioner] turned to Mr. Davis and said, "I just shoot them." Mr. Davis "took it, you know, as a joke . . . and kind of laughed it off. . . ." Mr. Davis testified that company policy and the law prohibited drivers from having weapons inside their trucks. Mr. Davis testified that [the petitioner's] fuel receipts showed that [the petitioner] purchased fuel at a Pilot station in Nashville at 12:33 p.m. on June 25, 2007.

After being recalled to the witness stand, Sgt. Postiglione testified that he interviewed Lucas McLaughlin, a fellow inmate of [the petitioner]. McLaughlin agreed to wear a wire and record his conversations with [the petitioner]. Sgt. Postiglione instructed McLaughlin not to speak to [the petitioner] about the homicide, but only the "solicitation case."

Two recorded conversations between McLaughlin and [the petitioner] on May 2, 2008, and May 16, 2008, were played for the jury. In the first recording, [the petitioner] told McLaughlin that he needed someone to be an alibi witness and testify that [the petitioner] refused consent for Sgt. Pos[tig]lione to search his truck. McLaughlin asked [the petitioner] for Lori Young's address. [The petitioner] told McLaughlin, "I would owe you dramatically[,]" and McLaughlin said, "Right, well my thing is, Lori goes away, you know[,]" to which [the petitioner] replied, "[Y]eah." [The petitioner] and McLaughlin discussed where to find Ms. Young, and McLaughlin said, "I'll blow the whole f[ ]ing house up. It's a gas leak." [The petitioner] replied, "[w]hatever. You know that's your, that's your thing." McLaughlin stated that after [the petitioner's] trial, they could "settle up." McLaughlin suggested that [the petitioner] work for his uncle's trucking company and pay McLaughlin ten percent of his earnings, and [the petitioner] agreed.

In the May 16, 2008, conversation between [the petitioner] and McLaughlin, McLaughlin asked [the petitioner] who "David" was and

8

stated, "[I]f I'm gonna pop his ass, I need to know why."  [The petitioner] told McLaughlin that he was a friend of Richie and Lori.  McLaughlin told [the petitioner], "I thought about it, and I'm just gonna do it how I'm gonna do it.  It's a gas leak in the trailer, and everybody blows up.  I'm happy. You're happy."  McLaughlin stated that he wanted to know "who the David guy was and if, if he was that big of a threat [because] one thing I don't like doing is innocent bystanders."  McLaughlin then asked, "[w]hat's one more explosion?" and [the petitioner] replied, "Yep."  McLaughlin asked [the petitioner] if they were "still on" and whether [the petitioner] would "pay [him] back."  [The petitioner] again replied, "Yep."  McLaughlin said, "I'm thinking like roughly fifteen, fifteen thousand.  And that's for the whole thing, everybody.  And you go about your merry day.  No witnesses show up for you."  McLaughlin told [the petitioner] that he would not contact him, and [the petitioner] said, "[n]o connections . . . . [j]ust the number to your uncle's trucking company."  McLaughlin told [the petitioner], "I ain't gonna do this, then you gonna wind up having remorse, or a guilty conscience or whatever."  [The petitioner] told McLaughlin to "do [his] thing" and stated, "I don't want to know."  [The petitioner] stated, "[t]he less I know, the better it is for you."

McLaughlin told [the petitioner], "if I blow up the trailer, and take out Lori and her son, I don't know his name," and [the petitioner] stated, "Richie."  McLaughlin then asked, "does David live there too?"  [The petitioner] answered "[n]ope" and told McLaughlin where David lived with his daughter.  McLaughlin asked, "[d]oes she need to go?" and [the petitioner] replied, "[n]ot really, no."  McLaughlin asked [the petitioner] if David, Lori, and Richie were "the only three that can hurt [the petitioner]," and [the petitioner] replied, "[y]ep."  The following exchange then occurred:

> McLaughlin:  Fifteen grand, I kill all three.  After that, you don't know me until you come out, then you just call that phone number, talk to my uncle.  My uncle will get you in touch with me.  But other than that, we don't know each other.
>
> [The petitioner]:  Alright.
>
> McLaughlin:  Is that a deal?
>
> [The petitioner]:  Yeah.

TBI Agent Steve Scott was qualified by the trial court as an expert in forensic firearms testing and ammunition testing. Agent Scott identified the rifle that was found inside [the petitioner's] truck as a .22 caliber rifle. A .22 caliber cartridge was found in the top drawer of a storage compartment behind the driver's seat in [the petitioner's] truck. Another .22 caliber cartridge case was found on the floor behind the passenger seat in the truck. A third shell casing was collected when the truck was processed for evidence, and a fourth shell casing was found on the floor of the passenger side of the truck.

Agent Scott also identified a nightstick that was found in a wooden drawer under the bed in [the petitioner's] truck. He identified two pairs of shoes and two sets of handcuffs that were found in the truck. Black electrical tape was found in an outer storage compartment on the outside of the truck on the passenger side. A second roll of electrical tape was in a storage compartment above the dashboard. A yellow notepad found in the truck had notes that read, "go back TA" and "4-sex okay." A logbook indicated that [the petitioner] was in Nashville on the afternoon of June 25, 2007. A box of cling wrap was found near the lower bunk in the sleeper portion of the truck.

Agent Scott examined a bullet recovered by the medical examiner from the victim's head and compared it to [the petitioner's] rifle. He concluded that the bullet was fired from [the petitioner's] rifle. Agent Scott also concluded that three of the four cartridge casings found inside [the petitioner's] truck were fired from [the petitioner's] rifle. The fourth casing did not have enough individual characteristics for Agent Scott to conclusively identify it, but he could not exclude the casing from having been fired by the rifle. Agent Scott observed what appeared to be "blood staining in some of the cracks and crevices" of [the petitioner's] rifle, but he did not test the stains to determine whether they were blood. He took swabs of the stains.

TBI Agent Linda Littlejohn was qualified by the trial court as an expert in the field of forensic testing of shoes and shoe prints. She testified that she compared a pair of [the petitioner's] shoes with casts of two different shoe prints made at the crime scene. With respect to the cast of one of the shoe prints at the crime scene, [the petitioner's] shoes "were consistent with size, shape and tread design so therefore they could have

made that cast or another shoe just like it could have made that impression."

TBI Agent Kendra Fleenor was qualified by the trial court as an expert in the field of latent print comparison. She processed [the petitioner's] truck and lifted latent fingerprints. She compared the fingerprints from the truck with those of Terry Sanders, David Powell, Richard Keim, the victim, and [the petitioner]. None of the victim's prints were in [the petitioner's] truck. The prints in the truck did not match Mr. Keim's, Mr. Powell's, or Mr. Sanders' prints. 25 of the prints taken from the truck matched [the petitioner's] prints. [The petitioner's] prints were found on a garbage bag and the .22 caliber rifle.

Agent Patrick Ihrie, of the DNA and serology unit, testified that semen was present in the victim's mouth, anus, and vagina, but the semen did not match [the petitioner's] DNA profile. The semen also did not match the DNA profiles of Lee Meeks, Wayman "Hollywood" Henderson, or the victim's other previous boyfriends. The semen also did not match the DNA profiles of Richie Keim, David Powell, or Terry Sanders. Agent Ihrie was unable to obtain a DNA profile from semen found on the victim's thigh.

Agent Ihrie testified that he removed and processed several items from [the petitioner's] truck. A utility knife with a removable razor blade and a "leather pouch to go with it" were recovered from the driver's side storage area. A second knife was found in "drawer number 3." "Sex toys" were also found in "drawer number 3." Agent Ihrie conducted DNA analysis from different areas of the sex toys. The DNA on the "tan device" that had what looked to be a "blood pressure inflating bulb on one end" was a mixture of male and female genetic material and did not match any samples from the known individuals. The DNA profile from the "red device" was also a mixture of male and female genetic material, and the "major contributor" was consistent with [the petitioner].

Agent Ihrie identified a knife found in the center console of [the petitioner's] truck. He testified that the knife was tested, and it was determined that blood was present on the blade edge. Agent Ihrie obtained a DNA sample, but the profile was "very small," and it indicated only that the DNA came from a female. Agent Ihrie also identified [the petitioner's] DNA on the handle of the knife.

11

Two sets of metal handcuffs were processed for DNA, and the test indicated the presence of human DNA, but the sample contained a small amount of DNA, and a profile was not obtained. A penis pump was found in the lower bunk area of [the petitioner's] truck. Plastic wrap was found in the cubby area behind the driver's seat and in the back floorboard.

Agent Ihrie tested and confirmed that several "reddish brown stains" in [the petitioner's] truck were blood. Blood found on the door jamb area of the truck matched the victim's DNA profile. Two of the 13 genetic loci were inconclusive. However, the report concluded that the chance that the blood on the door jamb belonged to a person other than the victim was only one out of 23 trillion. A blood sample taken from inside the driver's side of the truck also matched the victim's DNA profile. Four genetic markers were inconclusive, but only one in 85 billion Caucasian people would have the same profile. Another blood sample was taken from the back of the driver's seat and tested. 13 out of 13 loci matched the victim's DNA profile, and the probability of an unrelated individual having the same profile was one out of 15 quadrillion people.

Agent Ihrie also examined reddish brown stains on [the petitioner's] rifle. A blood stain on the "rear sight" matched the victim's DNA profile. Blood from the barrel where the "wooden part of the forearm and the barrel meet" also matched the victim's DNA profile, and Agent Ihrie testified there was a one in 1.4 trillion chance that it was someone other than the victim's DNA. Blood from "[n]ear the end of the barrel" also matched the victim's profile.

For the defense, TBI Agent Sandra Poltorak, an expert in the field of tire track comparison, testified that [the petitioner's] tire tracks did not match any of the tire tracks found at the scene where the victim's body was found. She also testified that the "stance measurement" between the tire tracks found at the scene was inconsistent with the "stance," or distance between the two front tires, of [the petitioner's] truck.

State v. Bruce D. Mendenhall, No. M2010-02080-CCA-R3-CD, 2013 WL 430329, at *5-13 (Tenn. Crim. App. Feb. 4, 2013), perm. app. denied (Tenn. June 12, 2013).

We will review the complaints of the petitioner, as best we understand them.

12

# ANALYSIS

Initially, we note that the petitioner's appellate brief does not include any references to the thirteen volumes of the trial transcript or the transcript of the evidentiary hearing on his petition. Rather, it sets out as the "Statement of Facts" only claims advanced by the petitioner at the evidentiary hearing but without page references to the transcripts. We found the petitioner's testimony difficult to follow and, in some cases, to understand exactly what his complaint was. While making our determinations regarding this appeal, we have reviewed the evidentiary hearing transcript but decline to search through the multi-volume trial transcript to locate testimony, if any, relevant to this appeal.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, our review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

13

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Testifying at the evidentiary hearing were the petitioner and one of his trial counsel. Counsel said he had been licensed since 2002 and had handled "more than a thousand" criminal cases, including those charging first degree murder.

The petitioner complained first that trial counsel had a time-dated and stamped photograph showing that thirteen minutes before the petitioner was interviewed by Metro Nashville police officers in civilian clothes, he was dressed in an orange jumpsuit and leaving a "police lab" building. He did not ask trial counsel that the photograph be entered into evidence and shown to the jury but "figured" counsel would do so. He did not produce this photograph at the hearing or explain why it was of significance, other than to say he "would have liked for [the photograph] to have been shown." As to this claim, counsel testified he recalled some sort of "inconsistency" in the photograph, but he saw no way such a claim would have assisted in the motion to suppress the petitioner's later statement to police officers. The petitioner maintained that he was not the person being interviewed during a videotaped interview, although counsel testified he believed that it was the petitioner who was shown in the video giving a statement to officers. Counsel consulted an expert in this regard but was unable to develop proof that the person in the video was not the petitioner.

The petitioner next asserted that, after reading the opinion of this court on direct appeal, he realized, as best we can understand, that trial counsel should have proved when "that curtain went closed." He provided no explanation as to how this could have been proven, how it was relevant, or if, in fact, such additional proof even was available.

Counsel was not questioned regarding this. The post-conviction court did not make a specific finding as to this claim, which we, likely as did the trial court, simply do not understand.

Regarding jury selection, the petitioner complained that trial counsel did not "get rid of a lot [of prospective jurors] I thought should have went." As to this claim, the post-conviction court accredited trial counsel's testimony that he did not recall the petitioner's asking for jurors to be stricken and that such determinations were strategic choices based upon counsel's experience. We agree with the post-conviction court that the petitioner failed to show that he was prejudiced by the fact that these jurors were not stricken from the jury.

Further, the petitioner said that trial counsel "could have showed evidence." He explained that when he arrived in Wilson County, apparently still in custody, he obtained a list of seven possible suspects for, as we understand, the homicide which was the basis for the conviction he now questions. He said he had sent the list to his children but did not have a copy for the court at the evidentiary hearing. As best we can understand, he did not give a copy to trial counsel.

The petitioner said that he wanted more DNA testing done, apparently on additional samples taken from the victim's body, but had "no idea" whether this had been done. As to this claim, the post-conviction court noted that expert testimony at the trial showed that the DNA samples taken from the victim could not be matched to any person in the DNA database. Further, the petitioner failed to show how any further testing would have benefitted his defense. Thus, as did the post-conviction court, we conclude that the petitioner failed to show that counsel was ineffective or that the petitioner was prejudiced thereby.

As to the claim of insufficient meetings with the petitioner, counsel said that he met with him more than any other client he had ever represented. On cross-examination, counsel said that, at any time, two or three attorneys were working on the petitioner's case. As to this claim, the post-conviction court concluded that the petitioner failed to show that trial counsel had been ineffective or that he had been prejudiced thereby. The record supports this determination.

Concluding his testimony, the petitioner said exculpatory evidence existed which would have helped him, including "[w]hose tire tracks were there," "[w]hose other shoe was that imprinted out there," and "whose gray hairs w[ere] found on her?" While the petitioner presupposes that counsel was ineffective for failing to identify the donor of the hairs found on the victim or to match tire tracks found at the scene, he has not explained how his counsel could have performed this function. Rather, a DNA expert, testifying for

15

the State, said he was unable to match the DNA to any in the database.  Accordingly, we agree with the post-conviction court that, as to this claim, the petitioner also has failed to show that trial counsel was ineffective or that the petitioner was prejudiced thereby.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE

16